# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| AGM II, LLC, | ) | |
| Plaintiff, | ) | Case No. 07 C 1980 |
| v. | ) | Judge Joan B. Gottschall |
| RUSSELL STADELMAN, II, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the parties' cross-motions for summary judgment. For the reasons stated below, the defendant's motion for summary judgment [34] is denied, and the plaintiff's motion for partial summary judgment [23] is granted.

### I. BACKGROUND[1]

The plaintiff, AGM II, LLC ("AGM"), acted as an administrative agent for various lenders. On or about June 22, 2005, it entered into a Master Financing Agreement for revolving credit with Worldwide Wholesale Lumber, Inc. d/b/a Veracor Wood Products International ("Veracor"). The Master Financing Agreement contained a choice of law provision, which selected Illinois law as binding on all disputes arising out of the Master Financing Agreement. The same day, Veracor executed a security agreement (the "Security Agreement"), which granted AGM a lien on all of Veracor's assets, including inventory and proceeds (the "Collateral"). AGM perfected the security interest in the Collateral by timely filing a Uniform

---

[1] The facts are taken in part from the parties' statements of material facts and are undisputed unless otherwise noted. Background facts are also taken from an order issued by the Bankruptcy Court, which were referenced in the pleadings of both parties. *See* Order, *In re Worldwide Wholesale Lumber, Inc. d/b/a Veracor Wood Prods. Int'l*, No. 06-01499-JW (Bankr. D.S.C. Feb. 12, 2007), attached as Ex. C to Pl.'s Compl.

Commercial Code ("UCC") financing statement with the Secretary of State of South Carolina. The defendant, Russell Stadelman, II ("Stadelman"), the president, CEO, and sole shareholder of Veracor, executed a personal guaranty for loans made to Veracor through AGM on or about June 22, 2005 (the "Guaranty"). AGM proceeded to make a series of loans to Veracor.

On April 12, 2006, three petitioning creditors filed an involuntary petition for relief against Veracor under Chapter 7 of the United States Bankruptcy Code. The Bankruptcy Court entered an order for relief under Chapter 7 on April 18, 2006, thereby rendering Veracor a bankruptcy debtor. AGM filed an initial proof of claim in the amount of $7,528,590.00, an amended proof of claim in the amount of $5,965,991.00, and a second amended proof of claim in the amount of $5,619,301.85.

On April 28, 2006, the Bankruptcy Court held a hearing on AGM's Motion for Relief from the Automatic Stay. The parties, namely AGM and the Trustee, agreed that Veracor's inventory needed to be sold promptly. The Bankruptcy Court terminated the automatic stay to permit AGM to exercise its rights to sell the Collateral. The same day, April 28, 2006, AGM conducted a UCC public auction of the Collateral and was, itself, the successful bidder with a credit bid of $1 million. AGM agreed to deliver to the Trustee any receipts of accounts receivable, that is, monies from the prior sale of inventory ("Non-Debtor Guarantor Collateral Proceeds"). It also agreed to direct all proceeds from the liquidation sales of the Collateral with the Trustee to be deposited in an escrow account. AGM subsequently sold the Collateral for a considerable profit. As of January 2, 2007, AGM had delivered to the Trustee approximately $4,356,849.00.

On February 12, 2007, on a "Motion . . . for Allowance of Claim and To Compel Payment Thereof," the Bankruptcy Court issued an order that allowed AGM's second amended

proof of claim, in part (the "Order"). The Bankruptcy Court did not allow the full amount of AGM's second amended proof of claim, namely $5,619,301.85; instead, it granted a claim in the amount of $3,866,460.85, which represented a reduction of $1,752,840. The Bankruptcy Court reduced the amount of the secured claim because: (1) it disallowed AGM's claim for a $750,000 prepayment penalty; (2) AGM reduced the amount of professional fees claimed by $2,840; and (3) the Bankruptcy Court set-off AGM's $1,000,000 credit bid for the Collateral, as a partial payment on AGM's secured claim. It ordered the Trustee to turn over to AGM the monies in the escrow account. The Trustee filed a motion to stay the February 12, 2007 order, but on April 6, 2007, the Bankruptcy Court entered an order directing the Trustee to turn over the funds. The Trustee tendered a check in the amount of $3,797,566.26 to AGM on April 9, 2007.

Shortly thereafter, AGM filed this suit against Stadelman. AGM alleges that it has not received repayment of its secured claim from the Trustee. It is therefore seeking to enforce the Guaranty against Stadelman to recoup $3,866,460.85, the sum owed by Veracor. It is also alleging fraud by Stadelman during the loan process.

## II. ANALYSIS

The parties have cross-moved for summary judgment. Stadelman brings a motion to dismiss for lack of jurisdiction under Federal Rules of Civil Procedure 12(b)(1), 12(h)(3), and 56. AGM moves for partial summary judgment only on Count I: breach of guaranty.

### A. Summary Judgment Legal Standard

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It is not appropriate if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In seeking a grant of

3

summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. In response, the non-moving party cannot rest on the pleadings, but must designate specific material facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324. When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the opposing party. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). On cross-motions for summary judgment, the traditional standards for summary judgment apply and each movant must individually satisfy Rule 56's requirements. *Blum v. Fisher*, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996)). The court therefore considers the merits of each motion separately and draws all reasonable inferences and resolves all factual uncertainties in favor of the non-moving party.

**B.      Jurisdiction**

AGM brought this case in federal court alleging diversity jurisdiction. Compl. ¶ 3. Stadelman argues that the undisputed facts disprove AGM's allegation in its complaint that the requirements for diversity jurisdiction are met. Diversity jurisdiction is proper where the parties are of diverse citizenship and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a)(1). It is undisputed that the parties are of diverse citizenship: AGM is a Delaware limited liability company with its principal place of business in Illinois and Stadelman is a

4

resident and citizen of Florida. *See* Def.'s Resp. to Pl.'s Statement of Facts ¶¶ 1-2. The amount in controversy is, however, vigorously disputed. Stadelman argues that it stood at $68,894.59 on the date the complaint was filed. AGM contends that it stood at $3,866,460.85. Both parties point to the same document as support for their position, namely the February 12, 2007 order of the Bankruptcy Court (the "Order"), claiming that the Order unambiguously supports their position.[2]

The parties agree that AGM's second amended proof of claim was allowed, in part, in the amount of $3,866,460.85 by the Bankruptcy Court on February 12, 2007. *See* Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 13. They also agree that the Trustee sent AGM a check for $3,797,566.26 on April 9, 2007, pursuant to the Order. *Id.* ¶ 16. However, they dispute the effect this payment had on the secured claim. According to Stadelman, the payment should be deducted from the secured claim and the amount in controversy is ascertained through simple arithmetic: $3,866,460.85 (the amount of the claim) minus $3,797,566.26 (the amount paid to AGM) equals $68,894.59 (the amount in controversy). Therefore, because $68,894.59 does not exceed $75,000, Stadelman asserts that the court lacks jurisdiction. AGM disputes that the Order requires that the sum paid by the Trustee to AGM be offset from the amount of its secured claim. Under AGM's interpretation of the Order, the $3,797,566.26 paid by the Trustee were proceeds from the sale of Collateral that belonged to AGM independently of its allowed claim for $3,866,460.85, which remains unpaid. The dispute seems to stem from confusion caused by two

---

[2] It does not appear that either party sought clarification from the Bankruptcy Court itself on the meaning of the Order, which would be the appropriate course of action if the Order was truly ambiguous. This does not affect the outcome in this case, however, because this court finds the Order to be unambiguous. Additionally, this court is not functioning as an appellate court in this case. It appears from the pleadings that there is ongoing litigation in the bankruptcy case and it is there, or in the district court in South Carolina, that any legal challenges to the Bankruptcy Court's orders must be brought. Accordingly, this court interprets the Order as it stands and does not review it for legal or factual correctness.

5

facts: (1) the amount of the payment and the amount of the secured claim are numerically very close; and (2) AGM was both the seller and purchaser of the Collateral at the UCC sale.[3] A closer reading of the Order clarifies the Bankruptcy Court's intent and illuminates the answer to the jurisdictional question.

In its February 12, 2007 Order, the Bankruptcy Court determined the amount of AGM's claim it would allow. *See* Order § II. AGM had, in its second amended proof of claim, asserted a claim of $5,619,301.85.[4] *Id.* at 6. The Bankruptcy Court found that AGM was entitled to principal in the amount of $3,085,972.00. *Id.* at 9. It found further that AGM was entitled to default interest as provided for in § 7.1 of the Master Financing Agreement and to professional fees. *Id.* at 11-12. It rejected AGM's claim for a $750,000 prepayment premium. *Id.* at 14. It found that AGM was entitled to a total of $3,866,460.85, itemized as follows:

| | | |
|---|---|---|
| Principal | | $3,085,972.00 |
| Default Interest | + | $1,387,803.00 |
| Professional Fees | + | $739,376.00 |
| *Sub-Total:* | = | *$5,213,151.00* |
| $1,000,000 credit bid [in the UCC sale] | - | $1,000,000.00 |
| *Sub-Total* | = | *$4,213,151.00* |
| Non-Debtor Guarantor Collateral Proceeds | - | $346,690.15 |
| **TOTAL** | = | **$3,866,460.85** |

---

[3] The Bankruptcy Court remarked on the unusual nature of this result, commenting that "[p]erhaps the unanticipated twist to the disposition of the proceeds held by the Trustee is AGM's rights as a buyer of the collateral it purchased." Order at 14. The Bankruptcy Court observed that the Trustee had not raised a formal challenge to the quickly-scheduled UCC sale or the commercial reasonableness of the sale, filed a subordination action, or otherwise sought to set aside the sale. *Id.* at 14 n.15. Any such claims are properly brought in the bankruptcy case, not in this one. It appears that litigation is ongoing in that matter. *See* Bankruptcy Court Order ¶ 9, *In re Worldwide Wholesale Lumber, Inc. d/b/a Veracor Wood Prods. Int'l*, Case No. 06-01499-JW (Bankr. D.S.C. Apr. 6, 2007) (noting that the Trustee "contends that unlawful conduct by AGM should prohibit payment to AGM" and has brought a motion under Federal Rule of Bankruptcy Procedure 9023, which provides for an amendment of judgment), attached as Ex. 4 to Def.'s Statement of Material Facts.

[4] The $5,619,301.85 included: Principal - $3,085,972.00; Interest - $1,387,803.00; Professional Fees - $742,216.00 (reduced to $739,376 by AGM); Prepayment Premium - $750,000.00 (disallowed by the court); less Guarantor Collateral Proceeds of $346,690.15.

*See id.* at 16 & n.19.

In a separate section of the opinion, the Bankruptcy Court discussed AGM's entitlement to proceeds from the sale of the Collateral. *See id.* § III. It noted that AGM had escrowed approximately $4.3 million "representing proceeds of the subsequent sale of the property and collection of account receivables." *Id.* It continued:

> The Court need only find that AGM's pre-petition claim equals one million dollars in order for AGM to be entitled to receive all of the proceeds from the post-UCC sale, with one million dollars of these funds representing AGM's secured claim and the remainder being property of AGM.

*Id.* (citing *Boender v. Chi. N. Clubhouse Ass'n, Inc.*, 608 N.E.2d 207, 214 (Ill. App. Ct. 1992) and *Wachovia Bank & Trust Co. v. McCoy*, 270 S.E.2d 164 (W. Va. 1980)).

The Bankruptcy Court concluded that the $3,791,120.48[5] held by the Trustee was "either post-UCC sale proceeds or funds received from accounts receivables." *Id.* at 15-16. It observed that the record contained insufficient information to determine to whom the accounts receivable monies were due, noting that those collected by AGM before the UCC sale belonged to the estate, but were encumbered by AGM's secured claim, and those collected after the UCC sale belonged to AGM. *Id.* at 16 n.17. Therefore, the Bankruptcy Court concluded that "AGM is entitled to receive all of the funds held by the Trustee," namely $3,791,120.48. *Id.* at 16. This section of the Bankruptcy Court's opinion is central to the parties' dispute. Stadelman emphasizes the following footnote:

> AGM's claim has been reduced . . . as a result of AGM's collection of Non-Debtor Guarantor Collateral Proceeds . . . and the $1 million credit bid [for the Collateral at the UCC sale] . . . *and shall be further reduced* to the extent that the funds held in the segregated account [under the control of the Trustee] constitute accounts receivables collected by AGM prior to the date of the UCC sale.

---

[5] The Trustee paid AGM $3,797,566.26; the reason for the $6,445.78 variance in the amount held on February 12, 2007 and the amount paid on April 9, 2007 is unclear from the record.

7

*Id.* at 16 n.19 (emphasis added by Stadelman). Stadelman reads this to mean that the monies paid by the Trustee to AGM should be deducted from the total secured claim. However, such a reading is wrong for two reasons. First, it ignores the unambiguous restriction of what sums would further reduce the claim, namely only "funds [that] constitute accounts receivables collected by AGM prior to the date of the UCC sale." *Id.* Second, it obscures the clear distinctions the Bankruptcy Court drew between: (1) the ownership and entitlement to proceeds received *before* and *after* the UCC sale; and (2) AGM's entitlement to its secured claim and its entitlement to profits made from the sale of Collateral after the UCC sale. As the Bankruptcy Court stated, "Once sold to AGM, [Veracor] and the estate lost any rights to the collateral." *Id.* at 15. The rights lost include the rights to money from the sale of inventory and rights to monies paid on accounts receivable that were received after the UCC sale.[6] The Trustee did not gain ownership rights in the surplus from the post-UCC sale of the Collateral just because AGM deposited those funds with the Trustee according to the Bankruptcy Court's directive.

From the Bankruptcy Order, it therefore becomes apparent that the similarity of the amount paid and the amount of the allowed secured claim is nothing more than quirk resulting from the amount of profit AGM secured on its post-UCC-sale of the Collateral and that AGM's status as seller and purchaser of the Collateral did not affect its entitlement to the full amount of its secured claim. A hypothetical illustrates the correctness of this interpretation: Purchaser A has no prior relationship with Veracor; AGM sells the Collateral to Purchaser A in a UCC sale; Purchaser A re-sells the Collateral to Purchaser B for a significant profit. The Trustee would obviously have no right to take the profits made by Purchaser A and use them to pay AGM's secured claim: any ownership rights of the Trustee were stripped away at the UCC sale. Just

---

[6] The Trustee *did* have rights to any *pre*-UCC sale accounts receivable that were mixed in with the "profits," although those monies were subject to AGM's secured claim. Order at 16 n.17.

8

because AGM was Purchaser A does not change this analysis and AGM is as entitled to its profits as Purchaser A would be. This interpretation is consistent with the case law, cited by the Bankruptcy Court and otherwise. *See, e.g.*, *Georgia-Pacific Corp. v. First Wis. Fin. Corp.*, 805 F. Supp. 610, 617 (N.D. Ill. 1992) (noting that the UCC imposes no obligation on a secured creditor who purchases collateral to credit the debt obligation with additional proceeds generated by the subsequent sale of the collateral); *Boender*, 608 N.E.2d at 214 (discussing disposition of surplus from a commercially unreasonableness sale of collateral to the creditor); *Wachovia Bank & Trust Co.*, 270 S.E.2d at 166 (W. Va. 1980) (finding that, under the UCC, when a secured party purchases the debtor's collateral at a sale, it acquires the rights of the debtor in the collateral discharged of the original security interest). Therefore, the court rejects Stadelman's interpretation of the Bankruptcy Court's order and finds that AGM is entitled to the balance of its secured claim in the amount of $3,866,460.85 *plus* any profits obtained from the post-UCC sale disposal of the Collateral.

To summarize, the court concludes that the Bankruptcy Court held that: (1) the amount of AGM's secured claim is $3,866,460.85; (2) any pre-UCC-sale accounts receivable monies are the property of the Trustee, but subject to AGM's secured claims; (3) AGM was entitled to the full balance in the account held by the Trustee, approximately $3.8 million; (4) the money held by the Trustee represented AGM's "profit" from the sale of its property (the Collateral purchased in the UCC sale) and possibly also pre-UCC-sale accounts receivable money, which would then reduce the amount of the secured claim.

The court is unable, on the record before it, to ascertain what proportion of the $3,797,566.26 paid is "profit" and what proportion is pre-UCC sale accounts receivable monies. If none of the balance represents post-sale profit, then the entire payment from the Trustee would

go to reduce the amount of the secured claim, rendering the remaining balance just $68,894.59, as Stadelman asserts. However, the court is required to construe all facts in favor of the non-movant, AGM, and a reasonable inference is that the entire $3,797,566.26 represents "profit" from the sale of the Collateral and that, therefore, the entire $3,866,460.85 balance of the secured claim remains unpaid. Because there is a genuine issue of material fact about the amount of the secured claim, Stadelman's motion for summary judgment on the basis of lack of jurisdiction is denied.

Notwithstanding the court's conclusion on a triable issue of fact above, it also "has an independent duty to satisfy itself that it has subject-matter jurisdiction." *See Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994). The general rule is that a court accepts a plaintiff's jurisdictional allegations as long as the sum claimed is apparently made in good faith and dismisses for want of jurisdiction only where it appears "to a legal certainty" that the claim is not in good faith. *See Horton v. Liberty Mutual Ins. Co.*, 267 U.S. 348 (1961). Given the analysis above, the record provides a sufficient foundation to support the amount in controversy alleged in the complaint. Therefore, the court may exercise jurisdiction over the case. *See* 28 U.S.C. § 1332.

## C. Count I: Breach of Guaranty

AGM has moved for partial summary judgment on Count I of the complaint, which alleges that Stadelman breached the terms of the Guaranty. AGM contends that the terms of the Guaranty are unambiguous and the Bankruptcy Court has fixed the amount of the secured claim against Veracor as $3,866,460.85. In response, Stadelman argues that: (1) the court lacks jurisdiction; (2) there is a genuine issue of material fact as to the amount due; (3) there is a genuine issue of material fact as to whether AGM released Stadelman from his obligations under

the Guaranty.

The court has already determined that it has jurisdiction and ruled that there is a genuine issue of material fact as to the balance of the secured claim. *See* § II(B) *supra*. The court now addresses Stadelman's defense to determine whether it defeats summary judgment on the legal claim itself.

Stadelman argues that he had an implied contract with AGM that defeats its claims under the Guaranty. He avers that in early 2006, AGM's lawyer attempted to work out a deal with Stadelman whereby AGM would not enforce the Guaranty if Stadelman agreed to a Cooperation and Release Agreement that was designed to protect AGM's interests in Veracor's Collateral. *See* Aff. of Stadelman ¶ 6, attached as Ex. 1 to Def.'s Resp. in Opp'n to Pl.'s Statement of Facts. Stadelman claims to have kept his side of the bargain. *Id.* ¶ 7. In a reply affidavit, AGM disputes Stadelman's claims. *See* Reply Aff. of Greg Bell ¶¶ 4-7 (disputing the import of the draft Cooperation and Release Agreement and whether Stadelman complied with its conditions). AGM also makes three legal arguments in response to Stadelman's defense: (1) the defense is waived because Stadelman has never pled waiver or release as an affirmative defense in this case before his response to AGM's motion for summary judgment; (2) the express terms of § 11 and § 12 of the Guaranty bar any such waiver or release unless it is in writing and signed by AGM; and (3) under Illinois law, there can be no implied contract where there is a written contract between the parties.

Federal Rule of Civil Procedure 8(c) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . estoppel; . . . release; . . . and waiver." Fed. R. Civ. P. 8(c). The Seventh Circuit has "stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are

11

deemed waived." *Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004). The principle of waiver of an affirmative defense typically governs in federal litigation, as a procedural rule of general applicability, even when the basis of federal jurisdiction is diversity of citizenship. *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1122-23 (7th Cir. 1998). There is an exception to the rule where "the application of the federal rule would interfere with substantial state interests." *Id.* at 1123. In *Herremans*, a contract breach case in which the defendant failed to raise a statute of frauds defense, the Seventh Circuit determined that this exception hurt, rather than helped, the defendant. *Id.* The court noted that Indiana followed the doctrine of "mend the hold" which operates as a "severe, rather than relaxed rule of waiver in contract cases." *Id.* The court observed that:

> The doctrine, intended as it is to discourage breaches of contract and thus to advance substantive state policy, prohibits a contract defendant without a good reason from adding defenses as the litigation unfolds, and it provides an additional ground for holding [the defendant in the instant case] to its waiver of the statute of frauds.

*Id.* In the absence of an excuse from the defendant as to the delay, the Seventh Circuit concluded that the affirmative defense was forfeited because the plaintiff "was deprived of an opportunity to conduct discovery that might have enabled him to rebut the defense." *Id.*

The case at bar is strikingly similar to *Herremans*. Both are contract breach cases. Illinois, like Indiana, observes the doctrine of "mend the hold." *See, e.g.*, *United Farm Family Mut. Ins. Co. v. Frye*, 887 N.E.2d 783, 790 (Ill. App. Ct. 2008) (collecting cases and discussing the doctrine's applicability to insurance claim denials); *Larson v. Johnson*, 116 N.E.2d 187, 192 (Ill. App. Ct. 1953) (applying the doctrine to bar a change in litigation strategy from allegations of fraud to a claim of indefiniteness in a real estate contract case); *Gibson v. Brown*, 73 N.E. 578, 582 (Ill. 1905) (holding a litigant to his defense of rescission and disallowing other grounds for non-performance of a contract (quoting *Ohio & Miss. Ry. Co. v. McCarthy*, 96 U.S. 258, 267-68

12

(1877)). Therefore, the substantive state policy of Illinois provides support for enforcing a waiver of any late-asserted affirmative defense in this case. The docket shows that Stadelman answered the complaint on November 15, 2007. He pled no affirmative defenses at that time, nor did he supplement his answer with affirmative matter alleging the existence of the putative implied contract. He invokes the defenses for the first time, it appears, in response to AGM's motion for summary judgment. Stadelman chastises AGM for failing to bring the Cooperation and Release Agreement to the court's attention. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 10. But, under Rule 8(c), the burden to raise the issue lay with Stadelman and he raised it only "at the eleventh hour, without excuse and without adequate notice to the plaintiff." *Castro,* 360 F.3d at 735 (quoting *Venters v. City of Delphi*, 123 F.3d 956, 969 (7th Cir. 1997)). The court finds that any affirmative defense is waived. Consequently, the court does not reach the parties' remaining legal arguments.

The parties do not dispute the existence or the terms of the Guaranty, whereby Stadelman agreed to pay AGM all amounts owed to AGM by Veracor under the Master Financing Agreement. *See* Def.'s Resp. in Opp'n to Pl.'s Statement of Facts ¶¶ 1-16, 19 (admitting factual allegations regarding the existence and scope of the Master Financing Agreement). They also agree that the Bankruptcy Court allowed AGM's secured claim in the amount of $3,866,460.85. *Id.* ¶ 17. The parties do dispute, however, how much, if any, of the secured claim has been paid.[7] *Id.* ¶ 18. Stadelman submitted additional facts in opposition to AGM's motion for summary

---

[7] Veracor's bankruptcy does not affect Stadelman's obligations under the Guaranty. *See Nat'l Tax Credit Partners, LP v. Haulik*, 20 F.3d 705, 707 (7th Cir. 1994) ("Bankruptcy does not affect third-party guarantees of a debtor's obligations."). AGM is prevented from obtaining a double recovery of its secured claim, through the Guaranty and through the bankruptcy proceedings, by the doctrine of subrogation. *See* 11 U.S.C. § 509(a) (providing that "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment").

judgment, but they all go to Stadelman's affirmative defense.  Therefore, he raises no triable issue of fact as to enforceability of the Guaranty.  Consequently, the court grants AGM's motion for summary judgment, finding that – based on the facts presented –  no reasonable jury could conclude that Stadelman is not liable for Veracor's debt pursuant to the Guaranty.  However, the court observes, as did the Bankruptcy Court before it, that AGM has not provided sufficient information about the funds deposited with the Trustee to enable an accurate determination of the balance remaining on the secured claim.  *See* § II(B) at 9.  Therefore, the court is unable to enter judgment on Count I at this time.

### III. CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is denied and the plaintiff's partial motion for summary judgment is granted.  The parties shall appear for a status hearing to discuss the manner and timing of prove-up proceedings.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 26, 2008